## CHARLES KANE v. MISSOURI PACIFIC RAILWAY COMPANY, Plaintiff in Error.

### In Banc, June 2, 1913.

1. **EXCEPTIONS: One to Overruling of Motion for New Trial and in Arrest.** Where the motions for a new trial and in arrest were overruled on the same day, "to which ruling and order of the court defendant at the time duly excepted," whether or not the rulings on the motions were announced separately, the exception was sufficient. The exception is always sufficient if it is as broad as the action of the court and made at the time.

2. ————: ————: **Technical Rules.** Technical rules are often established by express statute, and courts cannot escape them, even if they would. But courts disregard and brush aside any mere technicality, not established by statute, whose only office is to bar an investigation into the merits of a cause.

3. **NEGLIGENCE: Continuing to Work.** The fact that plaintiff at the time of the accident did not believe he was seriously injured and that he continued to work off and on for six weeks, does not prove that he was not seriously injured.

4. ————: **Independent Causes: Substantial Evidence.** Where the history of the case as detailed by plaintiff and his witnesses, together with the opinion of experts, affords a substantial basis for a connection of his injuries with the derailment of the train, and the defense is that his condition is due to anterior chronic diseases and is supported by much testimony and the opinions of many experts, it cannot be said that a verdict for plaintiff is, as to that point, based on mere conjecture.

5. ————: Evidence: Ultimate Fact: Cured by Withdrawal. Error in the question, which was: "Whether his condition is the result of the blow received in that accident?" and in the answer, which was: "I would say that this trouble resulted from the violence sustained," is corrected by a withdrawal of the question and answer during the further progress of the trial and a proper reframing of them.

6. ————: ————: ————: No Proper Objection. It is error to ask the witness if plaintiff's condition could be produced by the manner in which he was thrown down at the time of the accident, and an answer that the injury received in the back is the sole cause of his condition is also error. But where no objection was made to the answer, and the only objection to the question was that it was "conjectural," the assignment of the question and answer as error is not for consideration on appeal.

7. ————: Causal Connection: Derailment of Engine: No Side Bearings or Splashers. The mere proof of negligence is not sufficient to support a verdict. It is one step, but there is another, namely, the causal connection between the negligence and injury. It is not enough to prove that there was a derailment of the engine and tender, that plaintiff was thrown upon his back and injured, and that there was a negligent failure to provide side splashers in the tank of the tender and side bearings to the front trucks of the tender; the evidence must go further and cause it to appear, either by direct proof or reasonable inference, that the absence of the splashers and side bearings was the cause of the derailment, where their absence is charged to be the cause of the derailment. It is a matter of common knowledge that engines and cars do roll and become derailed without reference to splashers in the tank or side bearings on the tender trucks.

8. ————: ————: ————: ————: Proximate. The proximate cause of an event is that which, in a natural and continuous sequence, unbroken by any new cause, produces the event, and without which the event would not have occurred. To establish that the absence of splashers in the tank of the tender and of side bearings in the front trucks was the proximate cause of the derailment of the engine, it must appear with reasonable certainty that if they had been present the derailment would not have occurred, and the burden is upon plaintiff to establish this.

9. ————: ————: ————: ————: Res Gestae: Opinion of Engineer and Fireman: Verdict Based on Incompetent Evidence Unobjected to. Testimony of the division superintendent, that, on his arrival at the scene of the derailment of the engine and tender, six or eight hours thereafter, he met the engineer and fireman and asked them the cause of the accident, and that they told him that in their opinion the accident was caused by the

absence of a splash board in the tank of the engine and the absence of side bearings on the trucks, was incompetent, and though not objected to on that ground and for that reason its admission does not constitute reversible error, yet a verdict cannot be made to rest on incompetent hearsay evidence, even if not objected to. There being no other substantial evidence to show the causal connection between the derailment and the absence of the side bearings and splashers, the opinions of the engineer and fireman, so detailed by the division superintendent, should be disregarded.

10. ———: ———: ———: **Rough Track.** Rough tracks, soft tracks and unballasted tracks are not *per se* dangerous, nor are they unusual; and where no witness ascribes the derailment which caused the pilot's injury to the condition of the track, a jury should not be permitted to infer a derailment resulted from such condition.

11. ———: ———: ———: **No Side Bearings and Splashers: Conjectural Cause.** An engine and tender, equipped with side bearings and tank splashers, running backwards at ten miles an hour, without cars attached, might, on a good track, from some unexplained cause, derail on a curve. And where the petition charges that their derailment was due to the absence of splashers in the tank and side-bearings on the trucks, it cannot be assumed that their absence caused the derailment, even though it be conceded that their presence tends to prevent derailment; and there being no causal connection between their absence and the derailment shown by the evidence, a verdict for plaintiff is left in the realm of conjecture.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover*, Judge.

REVERSED AND REMANDED.

*Martin L. Clardy* and *Edw. J. White* for plaintiff in error; *Elijah Robinson*, of counsel.

(1) There was no substantial evidence tending to show any negligence on the part of the defendant resulting in the accident in question; nor was there any substantial evidence tending to show that plaintiff received any injury in that accident. Spohn v. Railroad, 87 Mo. 84; Spiro v. Transit Co., 102 Mo. App.

250. (2) It devolved upon the plaintiff to prove that the injury resulted from a cause which would render the defendant liable, and in leaving it to conjetcure as to what caused the derailment of the engine tank, he failed to establish a cause of action. Knorpp v. Wagner, 195 Mo. 663; Hill v. Drug Co., 140 Mo. 440; Smith v. Box Co., 193 Mo. 739; Beebe v. Transit Co., 206 Mo. 419; Morgan v. Mining Co., 136 Mo. App. 241; Caudel v. Kirkbride, 117 Mo. App. 417; Thornburg v. Mining Co., 126 Mo. App. 660. (3) The fact that there were no side bearings on the front of the tank did not constitute negligence on the part of the defendant. State v. Edwards, 203 Mo. 539. (4) Plaintiff's instruction allowed the jury to find for the plaintiff on either of two hypotheses; one of which was not supported by the evidence. There was no evidence that the rough, uneven condition of the track caused the derailment, or the absence of the side bearings on the front truck or the absence of splashers. All that the evidence on any of these allegations showed was that they might or could cause a derailment. The plaintiff, himself, alleged in his petition that the derailment was caused by running the engine backward and by excessive speed, and the jury could as well have found that these conditions actually caused the derailment. The giving of this instruction was clearly error because it enabled the jury to base a verdict wholly upon conjecture. Wojtylak v. Coal Co., 188 Mo. 284; Knorpp v. Wagner, 195 Mo. 638; Beebe v. Transit Co., 206 Mo. 419. (5) The verdict in this case was grossly excessive and for that reason the judgment ought to be reversed. Spohn v. Railroad, 87 Mo. 84; Adams v. Railroad Co., 100 Mo. 555; Chandler v. Transit Co., 213 Mo. 244; Chitty v. Railroad, 166 Mo. 435; Partello v. Railroad, 217 Mo. 645, 240 Mo. 143; Lessenden v. Railroad, 238 Mo. 247.

*Frank P. Walsh* and *E. R. Morrison* for defendant in error.

(1) There is nothing for consideration here but the record proper. Harrison v. Bartlett, 51 Mo. 170; St. Joseph v. Ensworth, 65 Mo. 628; Railroad v. Cauley, 148 Ill. 490; Mfg. Co. v. Lambertson, 74 Kan. 304; Walter v. Walter, 117 Ind. 247; Fales v. Fales, 29 R. I. 303. (2) Defendant was negligent in failing to equip the tender with splashers. Jones v. Railroad, 178 Mo. 528; Smith v. Fordyce, 190 Mo. 1; Charlton v. Railroad, 200 Mo. 413; Huhn v. Railroad, 92 Mo. 440; Hamilton v. Mining Co., 108 Mo. 364; Curtis v. McNair, 173 Mo. 170; Doyle v. Trust Co., 140 Mo. 1; Bender v. Railroad, 137 Mo. 240. (3) Defendant was negligent in failing to provide the front trucks with side bearings. See cases cited under preceding point. (4) The track at the point of the wreck was defective. (5) If plaintiff in his instructions assumed an unnecessary burden, it is not reversible error. Prewitt v. Railroad, 134 Mo. 615; Harrington v. Sedalia, 98 Mo. 585; Blankinship v. Paint & Glass Co., 135 S. W. 970; Jackson v. Insurance Co., 27 Mo. App. 62; Brooks v. Railroad, 35 Mo. App. 571; O'Neill v. Blase, 94 Mo. App. 648; York v. Bank, 105 Mo. App. 127. (6) The cause of plaintiff's condition was for the jury. MacDonald v. Railroad, 219 Mo. 468; Sharp v. Railroad, 213 Mo. 531; Fetter v. Fidelity & Cas. Co., 174 Mo. 256. (7) The verdict was not excessive. Gordon v. Railroad, 222 Mo. 516; Markey v. Railroad, 185 Mo. 365; Waldheir v. Railroad, 87 Mo. 37; Huggard v. Refining Co., 132 Iowa, 724; Railroad v. Kelly, 80 S. W. 1073; Harrold v. Railroad, 24 Hun, 184; Smith v. Whittier, 95 Cal. 279; Railroad v. Shelton, 69 S. W. 653; Railroad v. Barton, 130 Ill. App. 573; Railroad v. Friedman, 41 Ill. App. 270; Railroad v. Dalton, 120 S. W. 240; Shaw v. Railroad, 8 Gray, 45; Snell v. Oil Co., 106 S. W. 170;

Railroad v. Wallace, 45 So. (Miss.) 857; Whitehead
v. Railroad, 114 N. W. (Minn.) 254; Retan v. Rail-
road, 94 Mich. 146; Hall v. Railroad, 46 Minn. 439.

FERRISS, J.—Charles Kane, a brakeman in the
employment of the defendant railway company,
brought suit against that company for damages for
personal injuries which he claimed to have received
on the fourteenth day of October, 1902, while in the
employment of the defendant and engaged in his duty
upon a certain engine in charge of the servants of the
defendant. He alleges that said engine was suddenly
derailed, and that he was hurled from his place on
said engine and against the floor and sides of the cab
and boilerhead of said engine, and thereby permanent-
ly crippled and injured.

In his second amended petition he makes the fol-
lowing assignments of negligence:

"1. The track where said derailment occurred,
and adjacent thereto, was negligently and carelessly
permitted and allowed by the defendant to become and
remain in an unsafe and defective condition, in that
said track was rough and uneven, and caused engine,
tender and cars passing over same to roll and swing,
thereby becoming derailed and wrecked.

"2. The defendant negligently and carelessly al-
lowed and permitted said track, at and near the place
at which said derailment occurred, to become and re-
main in an unsafe, dangerous and defective condition,
in that said track was rough and uneven, and the ties
which support the rails thereof were old, decayed, de-
fective and weak, and the dirt under said track was
soft and loose.

"3. The defendant carelessly and negligently al-
lowed and permitted the tender of said engine, upon
which plaintiff was running as aforesaid, to be and
remain in a defective, dangerous and unsafe condition,
in this that there were no side bearings on the front

trucks of the tender of said engine, and no splashers in the tank of said tender to prevent the water in said tank from being thrown from side to side, and thus causing said tender to rock and sway.

"4. The defendant, its agents, servants, and employees, carelessly and negligently ordered, directed and permitted said engine and said tender, in said dangerous, unsafe and defective condition, to be run backwards, unattached to any car or other engine, over said dangerous, unsafe and defective track.

"5. The defendant, its agents, servants and employees, negligently and carelessly caused and permitted said engine and tender to be run over said track at a dangerous, unsafe and reckless rate of speed, to-wit, twenty to twenty-five miles an hour."

The petition further charges "that all of said dangerous, unsafe and defective conditions of said engine, tender and track and roadbed, were known to the defendant, or by the exercise of reasonable care and diligence might have been known." The petition then describes in detail the injuries, which were very serious and permanent in character.

The cause was tried in December, 1906, in the circuit court of Jackson county, and resulted in a verdict in favor of plaintiff for $30,000.

The testimony shows that plaintiff, at the time of the accident, was acting as pilot upon engine No. 1107 from Council Grove to Osage City—that is, he was taking the place of a conductor; that the engine was engaged in helping to move freight trains; that the engine at the time was running "light," without any cars, and furthermore, was running backward with the tender in front. Plaintiff it appears was sitting on a seat in the engine cab, when the engine suddenly left the track, causing plaintiff to be thrown on his back on the floor of the engine, which ran a short distance on the ties before it stopped. Plaintiff immediately took a red lamp, got off the engine, and started

back to flag a following freight train. He testified
that just as he started he felt a pain in his back and
that he complained of it when he met the train which
he went back to flag. At the time he did not think
he was seriously injured. As a matter of fact, he con-
tinued to work for the railroad, off and on, from the
14th day of October until about the 20th day of No-
vember, when he went to a hospital, and continued to
grow worse until he became completely disabled, and
was reduced to a most deplorable condition.

The evidence tended to show that there were no
splashers lengthwise in the water tank, but that there
were splashers crosswise. It is clear that the forward
trucks of the tender had no side bearings, and it also
appeared in evidence that the engine was derailed upon
a curve. One witness for plaintiff testified that the
track at that point was rough; another, that it was
a "soft track." There was some testimony on behalf
of the plaintiff that the roadbed at that point was not
ballasted and that the ground was soft. The testimony
for the defendant, on the contrary, showed that the
road was well ballasted and in good condition.

Plaintiff offered evidence tending to show that up
to the time of the accident he was in good health and
free from any physical ailment. The defendant of-
fered evidence tending to show that, prior to the ac-
cident, plaintiff was suffering from a chronic syphi-
litic complaint, and offered much expert testimony
to support the theory that his condition was the result
of that old trouble, and not the result of the accident.
The experts for the plaintiff, on the contrary, gave
testimony tending to show that his condition resulted
from the accident.

At the close of plaintiff's evidence the defendant
interposed a demurrer to the same, which was over-
ruled. No complaint is made of the instructions given
or refused, excepting so far as it is claimed that the
main instruction for plaintiff was not supported by

the evidence; nor are any objections urged here against the rulings of the court on the admission of testimony.

The defendant sued out a writ of error in this court, and charges in its brief that there was no substantial evidence tending to show negligence on the part of defendant, and no substantial evidence tending to show that plaintiff received any injury in the accident. It is further contended by defendant that there is no substantial evidence showing that the derailment of the engine resulted from the want of side-bearings or splashers, or on account of the condition of the track; in other words, that there is no substantial evidence to show that the alleged negligence of the defendant was the proximate cause of the accident. Defendant also claims that it was left to the jury to conjecture whether the condition of the plaintiff resulted from the accident or from his anterior physical condition. It is further urged by defendant that error was committed by the trial court in permitting certain questions upon a hypothetical case to be asked and answered in an improper form; also, that the verdict is excessive.

Plaintiff contends that there is nothing before this court except the record proper, because the abstract of the record shows but one exception by the defendant to the orders of the court overruling the motions for a new trial and in arrest, and that the record should show a separate and specific exception upon the overruling of each motion.

Such further detailed statement of the testimony as may be necessary to a full understanding of the points discussed will be found in the opinion.

I. The record shows the following entry:

"On the 31st day of December, 1906, defendant's motion for new trial and also its motion in arrest of judgment were overruled; and on the same day the court made and caused to be entered of record an

order giving defendant to the first day of October, 1907, term to file its bill of exceptions."

The bill of exceptions states:

"And afterwards at said regular October term, 1906, of said court, and on the 31st day of December, 1906, the said motions for new trial and in arrest of judgment were by the court overruled and denied; to which ruling and order of the court the defendant at the time duly excepted."

Plaintiff contends that because defendant failed to except specifically to the ruling on the motion for new trial, and again specifically to the ruling on the motion in arrest, the exception as made amounts to nothing, and that therefore the record proper only is before this court.

**Two Motions: One Exception.**

We are unable to assent to this proposition. Both the record proper and the bill of exceptions show that the two motions were overruled on the same day. The bill of exceptions states that to this ruling the defendant "at the time duly excepted." Whether the rulings on the motion were announced separately we do not know. If they were, then the language of the exception would be referable to each ruling. If there was but one announcement covering both motions, as was probably the case, an exception to this ruling would be a due exception at the time, and would necessarily relate to each motion. The authorities cited by plaintiff (Harrison v. Bartlett, 51 Mo. 170, and City of St. Joseph v. Ensworth, 65 Mo. 628) are not in point. Those cases hold no more than that a general exception to the rulings of a court is not sufficient, but that the several separate rulings in the course of the trial must be excepted to at the time they were made. The exception is to the action of the court; and if it is as broad as the action complained of, and made at the time, it is enough. To say that when a court by one order overrules two motions, the exception must in terms divide this order, and except specifically to each dissevered

member, is carrying technicality to an unreasonable extreme. We are sometimes compelled to refuse to examine a case on its merits because of the failure of the appellant to conform to certain rules of procedure which experience has shown are necessary, to the orderly administration of justice. Oftentimes technical rules are established by positive statute, and we could not escape them if we would. There is a just and increasing resentment against technicalties which prevent the full examination of a cause and judgment upon its merits. We may not violate in any case the express command of the statute. Where such statute exists, the remedy is with the Legislature. We conceive it our duty, however, to disregard, so far as we may, and brush aside mere technicalities whose only office is to bar an investigation into the merits of a cause. This point is ruled against the plaintiff.

II. Defendant contends that the cause of plaintiff's injuries was left to conjecture, and that the evidence did not connect the injury with the derailment of the engine. Plaintiff's evidence tended to show that he received a severe blow on his back when he fell from the seat to the floor of the cab, and that from that time on he continued to suffer and decline. True, he did not at the time believe he was seriously injured. He continued to work, off and on, for a month or more, but that fact does not prove that he was not injured. He testified that the pain persisted, and that from the time of the derailment of the engine his condition grew worse, until it resulted in total disability. It seems improbable that the fall from the seat to the floor of the cab could produce such serious results, but it cannot be said that plaintiff's condition was not caused by the fall. The experts for plaintiff attributed his subsequent condition to the injury received in the cab of the engine. The history of the case, as detailed by plaintiff and

*Cause of Injury.*

his witnesses, if believed by the jury, together with the opinions of experts, if also accepted by the jury, affords a substantial basis for the finding favorable to plaintiff so far as this question is concerned. The main defense was that the condition of plaintiff was due to another and anterior cause—to a chronic ailment which experts for defendant said could and did cause it. Defendant developed a strong defense along this line; but, after all, it was for the jury to determine which of the conflicting theories was the correct one, both of which were supported by substantial evidence and expert opinions. The question discussed in this paragraph received thoughtful consideration from LAMM, J., in MacDonald v. Railroad, 219 Mo. 468, a case where it was claimed that there was no evidence to show that the death involved there resulted from the injury. There, as here, independent causes were suggested, and conflicting theories developed before the jury.

III. Defendant in its reply brief urges that error was committed in the form of questions and answers upon a hypothetical case. The brief correctly states one question complained of thus: ''Whether his condition *is* the result of the blow received in that accident.'' The answer was, ''I would say that this trouble resulted from the violence sustained.'' It is properly

**Evidence.**    urged that this form of question and answer invades the province of the jury. The brief, however, fails to state the fact that this question and answer were withdrawn from the jury next day and properly reframed. We think that by this action the error was corrected.

Again, the brief states that this question was asked: ''Whether or not, in your opinion, the condition you found Mr. Kane in *was* or *could be* produced by the circumstances that I explained to you which took place in the engine that night, by being thrown down

there." The answer to the question was: "It is my opinion that the injury received in the back was the cause—the sole cause—of his condition today." Again, the brief fails to state that the question was reframed before it was answered by omitting the word "was," so as to read whether the condition "could be produced," etc. Notwithstanding the question was properly reframed, the answer was as above and was improper. However, no objection was made to it, nor motion to strike it out. Indeed, counsel for defendant who tried the case below objected to the question, not because it asked an opinion upon the ultimate fact to be found by the jury, but because it was "conjectural;" that is, that it did not call for an opinion upon the ultimate fact. He framed a hypothetical question to his own witness in the form properly condemned in the supplemental brief filed by other counsel. The subject received recent consideration in State v. Hyde, 234 Mo. 200, and what we said there need not be repeated here. This point is ruled against defendant.

IV. The serious question in this case, and one not free from difficulty, is whether there is substantial evidence to support the finding of the jury that the derailment of the engine was caused by the alleged negligent condition of the tender and track. The question of excessive speed was instructed out of the case.

Causal Connection Between Defective Engine and Derailment.

This instruction was given for plaintiff:

"1. The court instructs the jury that the duty which the defendant owed to the plaintiff, Charles Kane, at the time and place in question, was this: Defendant was required to exercise reasonable care to furnish the plaintiff with a reasonably safe place in which to work, and a reasonably safe tender with which to work. If, therefore, you believe and find from the evidence that on the 14th day of October, 1902, plain-

tiff was required, in the discharge of his duties as an employee of defendant, to be upon the engine mentioned in evidence, and that said engine was derailed at a point about three miles east of Admire, Kansas, and that the track at said point was negligently and carelessly allowed and permitted by defendant to be and remain rough and uneven, and that by reason thereof the same was not reasonably safe for engines and tenders passing over the same, and that there were no side bearings to the front trucks of the tender mentioned in evidence, and no splasher in the tank of said tender to prevent the water therein from being thrown from side to side, and that thereby said tender was caused to rock and sway, and that the failure, if any, of defendant to equip said tender with side bearings and splashers was negligence and carelessness on the part of the defendant, and that said tender was rendered thereby not reasonably safe; and if you further believe and find from the evidence that said engine and tender, were derailed by reason of said condition of said track and tender, if you find them to have been in the condition above submitted, and plaintiff, Charles Kane, was thereby thrown from his place and injured; and if you further find that defendant knew of the unsafe condition, if any, of said track and tender, or by the exercise of reasonable care might have known of the same in reasonable time to have repaired the same by the exercise of reasonable care, prior to the occurrence in question, but negligently and carelessly failed to do so, then your verdict must be for the plaintiff.''

We may concede that there was sufficient evidence to authorize the jury to find that it was negligence to fail to provide splashers and side bearings, yet such finding is not enough to entitle plaintiff to recover, unless it further appears, either by direct proof or reasonable inference, that the absence of these appliances was the proximate cause of the derailment.

"The mere proof of negligence is not sufficient to support a verdict. It is one step, but there is another, to-wit, the causal connection between the negligence and the injury." [Deschner v. Railroad, 200 Mo. l. c. 333.]

A cause is proximate when by a natural and unbroken series of events it produces the injury complained of.

In order to establish that the absence of these appliances upon the trucks and within the tank was the proximate cause, it must appear with reasonable certainty that if they had been present the derailment would not have occurred, and the burden was upon the plaintiff to show this.

"The proximate cause of an event must be understood to be that which, in a natural and continuous sequence, unbroken by any new cause, produces that event, *and without which that event would not have occurred.*" [Dickson v. Omaha & St. L. Railway, 124 Mo. l. c. 149; 1 Shearman and Redfield on Neg. (6 Ed.), sec. 26.]

In Jones v. Railroad, 178 Mo. 528, a wild car ran from a sidetrack onto the main track and there produced a collision and consequent injury to the plaintiff. The plaintiff charged that the company was negligent in that it failed to maintain a derailing switch at the end of the sidetrack. This court held that the fact that there was no derail switch was no negligence, *per se;* yet it was left to the jury to say whether a side track without a derail switch was a reasonably safe appliance. In that case, however, this court said (p. 549): *"It is quite plain that if it had been so equipped this accident would not have occurred."*

The same question was presented in Smith v. Fordyce, 190 Mo. 1, where GANTT, J., speaking for the court, says: "We do not, therefore, say that the defendant in this case was negligent because the sidetrack was not equipped with the derail switch, although

it is quite evident that if it had been so equipped this accident would not have occurred. Therefore, the question of whether the spur track in this case was a reasonably safe appliance without a derailing switch was a question for the jury, and such is the view taken by the circuit court, and it was left to the jury to find whether the injury to plaintiff resulted in part on account of the absence of a derailing switch."

In Curtis v. McNair, 173 Mo. 270, the plaintiff was injured by the sudden blowing out of melted iron, hot ashes and slag from a furnace, as he was passing in front of the same. The question was presented whether the defendant was negligent in not having at the time in front of the furnace a screen which was ordinarily placed there to guard against such blow-outs. It was held by this court that under all the circumstances of the case it was for the jury to say whether the absence of the screen was negligence; but there was no doubt that had the same been present the injury would not have occurred. In other words, its absence was the proximate cause of the injury.

These cases, together with Hamilton v. Coal Mining Co., 108 Mo. 364, and Huhn v. Railroad, 92 Mo. 440, are urged upon our attention as authority for the proposition that it was for the jury to say whether the absence of the appliances involved in this case was negligence. It will be observed, however, that in all these cases it is clear that the injury would not have been inflicted had the appliances there involved been present. Plaintiff appears to have tried his case upon the theory that it was enough for him to satisfy the jury that there was negligence in failing to equip the tender with splashers and side bearings—that the inference must follow that if these appliances had been present the derailment would not have occurred. But does such inference naturally follow? Could the jury say with any reasonable certainty that the engine would have remained on the track if side bearings and

Kane v. Railroad.

splashers had been present? Where is the evidence to support such a conclusion? The burden is upon the plaintiff to furnish such evidence.

In Byerly v. L. P. & Ice Co., 130 Mo. App. 593, the plaintiff, working for a mining company, was directed to do some work on the top of a pile of tailings, in close proximity to electric wires which were without insulation and which were heavily charged. Byerly was found dead on a spot where he might have come in contact with the wires. The wire company was sued for negligence in maintaing such wires in a dangerous condition. The defendant denied that it was negligent. The evidence showed that the death might have resulted from contact with the electric wires, but also that it might have resulted from other causes. The court found against defendant on the question of negligence, but sustained the nonsuit which had been forced by the trial court on the ground of failure to prove that the negligence was the proximate cause of the injury. On this point, the court says:

"Finding that the defendant was negligent, the next subject of inquiry is whether the evidence reasonably supports the inference that such negligence was the producing cause of Byerly's death. We sanction the contention of plaintiff that the causal connection need not be shown by direct and positive evidence, but may be shown by other facts and circumstances, and that in the consideration of a demurrer to the evidence, every reasonable inference should be indulged in favor of the plaintiff. But the rule is elemental that the burden remains with plaintiff to the end of the case to establish by proof not only the fact of the negligence averred, but also to show a direct connection between such negligence and the injury. When the ultimate fact is not susceptible of direct proof, its existence must directly follow as a reasonable conclusion from its basic facts and circumstances, and it may be stated as an axiomatic rule that whenever a court or jury is left

by the evidence in a situation where, in order to find the ultimate fact alleged, they must piece out the facts adduced with conjecture or supposition, the plaintiff must be held to have failed in his proof. Where the evidence shows the injury might have been caused by the negligent act, but, in its aspect most favorable to plaintiff, is just as consistent with the inference that the injury might have been produced by another cause, to send the case to the jury would be to accord them the right to make an arbitrary choice between equally probable but unproved conclusions, and thus the verdict, if for the plaintiff, would be based not entirely on evidence, but in part on mere speculation and conjecture. This would mean a reversal of the rule imposing the burden of proof on the plaintiff, since the defendant, in order to prevent the jury from making him the victim of conjecture, would be forced to assume the burden of showing that his negligence did not produce the injury. [Dunphy v. Stock Yards Co., 118 Mo. App. l. c. 516; Trigg v. Ozark Co., 187 Mo. 227; Goransson v. Mfg. Co., 186 Mo. 300.]''

In Beebe v. Transit Co., 206 Mo. l. c. 441, this court cites with approval from Judge DILLON, in Jones v. Yeager, 2 Dillon, 68, this:

''In the application of these principles to the evidence, you will first inquire whether the boilers in this case were unsafe or unfit for use, and, if so, whether the defendant knew it, or as a reasonable man, having a due regard for the safety of his employees, ought to have known it; for, if he ought, his neglect in this respect would be equivalent in imposing liability to actual knowledge; and in the next place you must inquire, and, in order to hold the defendant liable, must find from the evidence, that this defect was the direct and immediate cause of the accident, without which it would not have happened; and, if you thus find, then the defendant would thus be liable.''

In Plefka v. Knapp, Stout & Company, 145 Mo. l. c. 318, this court says:

"The defect in the appliance that plaintiff was given to use, as charged in his petition, was that a shoe had been removed from the base of the carriage of the hoister, and it is alleged that in consequence thereof a board that was being hoisted by plaintiff fell from the machine and struck him upon the foot. To have maintained plaintiff's action it was necessary for him to have shown either directly, that the board that fell upon his foot slipped or fell out of the machine, because of the absence of the shoe, or a state of facts so connected with and related to each other must have been shown, that the conclusion therefore might reasonably and fairly be made that such was the cause of the fall of the board. The mere proof of the absence of some particular part of the machine that is being used, and the proof that an injury has occurred to a person using the machine in that condition, does not fill the measure of proof of the charge that the injury was occasioned on account of the absence of the detached part of the machine." Again, on page 319: "Without knowing what the disturbing force or motion was that occasioned the board to fall from the machine, or without being able to tell just how the board did fall, the merit of the worth of the shoe on the machine, over the iron strap used in this instance, as a preventive against accidents from falling boards, could not be calculated or determined."

To the same effect is the statement of LAMM, J., in Harper v. Terminal Co., 187 Mo. l. c. 586:

"In the philosophy of the law of actionable negligence the proof of the negligence itself is but one step toward recovery, Another step is to show by direct testimony, or by the proof of such facts as logically create the inference, that the negligence proved proximately caused or contributed to the injury. The one step, without the other, is idle and might as well not

be taken. Hence in this case, if it be conceded, *arguendo*, that the brakemen were not in proper position, and if it be conceded further that such failure was negligence *per se*, yet if there was no causal connection between such negligence and Harper's death, the negligence became innocuous. [Walsh v. Railroad, 102 Mo. 587.]"

Guided by the principles above enunciated, we will proceed to examine the evidence adduced by plaintiff as bearing upon the question of proximate cause.

Plaintiff testified that he knew from his experience as a railroad man that a splasher was an appliance placed in the center of the tank to control the water and break its pressure, and to keep the engine from rolling from side to side and keep it from tipping; also that he knew what side bearings were on a tender. He stated: "They are on the truck to balance the tank from tipping from one side to the other from the motion of the engine."

"Q. Do these come together—are they attached, or is there a play? A. There is a play between— that much between the sides—to give them so much play on either side, if there is a rough piece of track, and going around sharp curves."

He testified that the accident occurred on a curve, but could not say whether it was a sharp curve. Speaking of the roadbed, he said that when he got off the engine he noticed it was "pretty soft—sandy-like."

"Q. How did you come to notice it? A. I sank down in it. The ties were broke and stuck up on the end; just like breaking them in two, and they stuck up. Q. And your feet went down in the soil? A. Yes, sir. Q. How deep did they go? A. I didn't wait to look to see how deep, but I know I went down quite a ways. Q. Enough to tell whether it was soft or not? A. Yes, sir, I know it was good and soft. Q. How was it—hard or soft? A. It was soft."

The fireman, Wilcox, who was on the same engine with plaintiff, testified that a splasher runs the length of the tank, from the front back.

"Q. Made of what? A. Made of sheet-iron, to keep the water from splashing from side to side in the tank."

Wilcox further stated that to the best of his knowledge there was no splasher in the tank; that he looked through the manhole in the tank every time the engine took water. He stated further, on cross-examination, that there were sheet-iron strips in there, but that he would not call them splashers.

"Q. Will you tell the jury that there were not seven splashers in the tank? A. I never went into the tank to count. Q. Will you tell the jury that there were not seven splashers, or do you know? A. I do not know."

So far as the question of splashers is concerned, it seems to be conceded that the tank was equipped with splashers running crosswise, but not that there were splashers running from end to end, although witness Hunter states for the plaintiff that there was a splasher running lengthwise, reaching up eight or twelve inches from the bottom, but which he called a slush-board.

Witness Wilcox testified that at the time of the accident the tank was about half full of water. He also testified on the subject of side bearings as follows:

"Side bearings on a tank are about half way between the top of the tank and the bottom of the tank to keep the tank from rolling from side to side."
He further testified that there were no bearings on the front trucks of the tender.

"Q. Now state what occurred about this accident? A. Just as we passed over bridge 102, around the curve there, the tank commenced to roll and rolled very high, and as it started rolling the engine rolled

251 Mo.—3

and next thing it hit the ties—the back wheels of the truck hit the ties. Q. Left the rails? A. Left the rails. Q. How far would you say the engine ran in that condition. A. About 150 feet. Q. Is there anything that is in common use on the front trucks of a tank to prevent it from rolling? A. Nothing except side bearings. Q. You never saw anything else? A. Not that I remember. Q. Are all side bearings alike? A. Well, some of them are put on in a little different form from others; some are adjustable and some made rigid."

As to the condition of the track this witness testified as follows:

"Q. What condition was the track in at this curve? A. It was rough. Q. How was that as to being on a curve or a straight piece of track? A. It was on a curve."

This witness also testified that the engine was running about ten miles an hour at the time of the accident. He made an earlier statement in which he fixed it at from eight to ten miles.

Witness Charles Snyder testified as follows:

"Q. Mr. Snyder, will you tell us please what side bearings are on a tender? A. Well, side bearings are bearings that are set on the side of the truck here (indicating), and swing between to steady the tender and keep it from rolling too far. Q. What are splashers? A. They are used in the tank to steady the water. Q. What are they made of? A. Usually sheet-iron. Q. I will ask you whether or not on October 14, 1902, or prior to that time, right immediately prior to that time, in that vicinity, it was generally customary to have splashers in tanks of the type of No. 1107? (No answer.) Q. Well, was it customary at that time, generally speaking? A. Well, in tanks of that size it was generally customary to have splashers. Q. Are you speaking of that time, or of the present time, or both? A. Well, both. Q. What would be

the effect in passing over a rough track, with a tank that had no side bearings on the front trucks, the engine running backwards at ten miles an hour, with no splashers in the tank, with a 4500-gallon tank like they had on engine No. 1107? A. Well at ten miles an hour, the tank ought to ride all right.''

On re-examination, this witness testified thus:

''Q. Under ordinary conditions, going ten miles an hour, you would not expect the tank to lurch? A. No, sir. Q. And if it did lurch, you would look for some unusual cause? A. Yes, sir; possibly side bearings gone, or something like that.''

Witness Hunter, former superintendent of division, not in the employ of defendant at the time of the trial, testified that the engine was wrecked on a curve, and that the roadbed was in ''what we term in railroad sense a soft condition.''

''Q. What was that—just describe it. A. Well, owing to the rains that had been over the territory previous to that time, the ballast had become wet, soft and soggy. Q. What effect does that have on the track, with reference to making it rough or even? A. It naturally removes the solidity of the track and makes the track soft, and the ballast easily gets from under the ties and rails; it is what we term in a railroad sense a soft track. Q. Just describe, if there was any ballast there, how it was A. It was dirt ballast, and perhaps a few rocks gathered out of the cut at that place and thrown in among the dirt. Q. When an engine is running going round a curve, what is the effect of the side bearings? A. The tank or car works on a center pin in the center of the truck. The side bearings are placed there so that a tank or car can't swing on the side over the edge of the track. Q. Just describe what the effect is; first, what the effect is when the side bearings are on, and, second, what the effect is when there are no side bearings? A. The absence of side bearings will prevent the

truck from curving with the car or engine. The absence of side bearings would produce the effect—of course the tank would follow the engine, and the absence of side bearings would produce a rigid truck, and the truck would take to the curve and climb the highest point of the curve—just the outside of the curve. Q. What becomes of the tank when it climbs that way? A. It would be liable to derail the truck. Q. Was there any side bearings on the front trucks of the tender? No, sir."

In answer to a question, the witness said: "A splasher is a board that is placed lengthwise in the inside of the tank where the water is carried, to prevent the water from rolling from one side of the tank to the other. There were no splashers in the tank in question."

"Q. Did you look that very morning? A. I did. Q. I will ask you to state whether or not, when you got there, you found Engineer Green and Mr. Wilcox? A. Yes, sir. I will get you to state whether or not Mr. Wilcox or Mr. Green, or both of them called your attention to the absence of these splashers and the absence of these side bearings, and whether or not they gave any reason as to why that engine went off the track there? A. On arriving there I met Engineer Green and Fireman Wilcox, and I asked them the cause of the accident, and they told me that in their opinion the accident was caused by the absence of a splash-board in the tank of the engine, and the absence also of the side bearings on the front trucks."

Witness Beattie stated that a side bearing is "a piece of iron on top of the truck and on the bottom of the car to keep either a car or tank from swinging too much. Q. Do they have the same sort of appliances on the trucks—the rear trucks and the front trucks—of the tender as to bearings? A. As to bearing, yes. Q. The same kind? A. About the same kind."

The witness said that he did not know whether, on this class of engine on the Missouri Pacific, they had at that time on the front of the tenders a different appliance from that which they had on the rear trucks, or that it was called a clear bolster. Witness said: "I don't know what they had on those engines at that time. Q. What was the condition of the track— I mean the ground right under the rails and ties. What was the condition of the roadbed where the engine went off the track? A. Well, it was very soft ground— nothing but very common dirt—no ballast." The witness further testified that the weather was clear at that time; that it was a dry time of the year, and that it had not rained recently.

John T. Murray, a locomotive engineer, testified that he had observed splashers on water tanks; that a splasher is a protection on a tank, and keeps the water from slushing.

"Q. Just describe what a splasher is? A. Well, there is different kinds of splashers. Some of them are lengthwise in the tank—in partition like—running from the bottom to the top of the tank; others are a kind of crossbar, probably four to six inches wide, extending from one side of the tank to the other. Some tanks have them both ways, lengthwise and crosswise. Q. What effect do they have on the motion of the tender? A. Well, they keep the water from surging, they make a tender ride very steadily; that is, they kept the water from surging from one side of the tank to the other, and steadied the tender. Side bearings are to steady a tank—to keep it from rocking. Q. Now, what is the effect in going around curves, when it has side bearings? A. Well, they prevent the tank from rocking—steady the tank. Q. I will get you to state whether or not, in October, 1902, and for some years prior to that time, side bearings were in common use upon tank trucks upon trains in this vicinity running in and out of Kansas City from Kansas? A. I

know that side bearings were used at that time. Q. Were they in general use? A. Yes, sir.''

It seems to be conceded that there were no side bearings on the front trucks, but defendant claims that a ''bolster'' was used for the same purpose.

''Q. Was your attention ever called to what they call a clear bolster? A. A bolster? Q. A clear bolster on the trucks of the tender? A. I never heard of it called that name. Q. Sir? A. No, sir; I don't recollect anything about it. Q. You said you never heard it called that? A. No, sir. Q. Well, what did you hear it called? A. I heard it called side bearings. Q. Were these side bearings sometime different on the front trucks from what they were on the rear trucks? A. Yes, sir, they differed on several different engines. Q. They differed in construction, you say? You called them all side bearings? Is that correct? A. They answered that purpose. Q. And somebody else may have called them bolsters or clear bolsters? A. They probably did, but I never heard them called that.'' The witness said: ''If you had side bearings on the front trucks, it wouldn't make any difference if they were not like the ones on the back trucks, if they answered the purpose. Q. If there was something there to break the force of the motion, that would be all that was necessary? A. If they were there properly. Q. Different constructions were advised by different people for different engines, and different ways? A. Yes, sir.'' This witness further said: ''All the engines that I ever ran were equipped with side bearings,'' and that he had run as many as four dozen engines in the last six years.

Witness Hunter, recalled by the defense, testified:

''Q. Did you see any of these splashers, or these things you spoke of, in there? A. Not what I consider splashers. Q. Did you see anything in there then? A. No, sir. Q. You didn't see anything in there? A. There was a slush-board at the lower part of the

tank that reached up a few inches from the bottom—all the way from eight to twelve inches. Q. Was there any water in that tank? A. Yes sir, I should judge, six inches. Q. About six inches of water in that tank? A. If the tank had been level. Q. If there was about six inches of water in that tank it didn't make very much difference whether there were any splashers in it or not; six inches would not roll enough to knock it off? A. It might have been possible that the water had leaked out of the tank when this engine ran off the track, or broke the hose. Six inches of water couldn't roll very much. Q. When you looked at the engine next day, at Osawatomie, the water was out of it? A. Yes, sir. Q. How was the splasher that was in there, if there was one, fastened to the bottom? A. I don't know sir; I didn't get in to examine it. Q. You did see a splasher inside of the tank? A. Yes, sir. Q. Which way did it run? A. Length-wise. Q. It ran lengthwise? A. As I remember, I looked down from the rear of the tank into the manhole, and discovered a slush-board in that position. Q. Now, is it not a fact, Mr. Hunter, that tank had seven splashers all located as that drawing shows? A. If it had I failed to see them. Q. Did you look for them? A. It was my business. When I looked in that engine I would see them. Q. I want you to tell these twelve gentlemen if there were not seven splashers in that engine, located as shown in that plat? A. If they were there I failed to see them. Q. Could you have seen them if they had been in there? A. I think if they had been there I would have seen them. Q. How did you look? A. I looked down the manhole. Q. You stuck your head down in it? A. I don't know whether I had my shoulders in it or not; but I looked; and satisfied myself to that extent, that what I considered a splasher-board wasn't there.''

On the cross-examination of witness Wilcox it developed that he made a written report of the acci-

dent, to which he signed his own name, Kane's name and Greene's name, which report was as follows:

"Pusher engine 1107, while backing up tank jumped the track, derailing engine and tank on curve about three miles east of Admire, tearing up about 50 yards of track—was running about twelve miles an hour when accident happened—damaged engine by tearing off sand pipes, and tank by tearing off break rigging and train line. Disconnected engine after being pulled on track and towed to Osawatomie. Time of accident, 1:38 a. m., 10-14-02."

"Q. Now, I want you to tell the jury if there was any bad track there, rough track; and if there was no side bearings and no splashers in the engine, why didn't you mention them as the causes of the accident. A. Because it was none of my business."

The above report was made on a form which contained the following:

"Order of report: First, a concise narrative account of the accident or matter to be reported, including the date, time of day or night, and location of the occurrence, rate of speed train was running, cause of accident, etc."

Witness stated that as long as he had worked for the railroad he never read one of these reports over, and further said: "When I came to make my report, I set down and made it out the way it happened."

Plaintiff Kane, after he got back to Council Grove, dictated, and it is evident from his testimony that he signed, the following report:

"2:30 a. m. Telegraphic report of accident. Admire Station, October 14, 1902. To H. D. H. [Division Superintendent] Time of accident 1:40 a. m. Train No. extra engine No. 1107; engineer Green; conductor Chas. Kane."

Among other things in the report appeared the following:

"2. Cause of accident: Tender leaving track.

"3. If any persons are injured, state who, and injuries to each person: None.

"Chas. Kane, conductor."

This report says nothing about the condition of the tender or the track.

On October 15th the plaintiff signed another statement which contained the following:

"I started to follow 1-80 to assist them over Miller grade, and tank of engine 1107 left the track at a point three miles east of Admire, causing engine and tender both to leave the rail, damaging about 200 feet of track. Was running at the time about twelve or fifteen miles per hour, as we were looking out for 1-80 on the curve. Cannot say as to full extent of damages to engine 1107.

"Chas. Kane, pilot."

Hunter, the superintendent, sent the following wire, October 14th, to A. D. B., meaning A. DeBernardi, the man in authority over him:

"Cause of accident to engine 1107, three miles east of Admire. Engine running backing up, and engine tank rolling on curve, causing rear truck to lift and leave rail; damage to engine twenty dollars; damage to truck, forty-five dollars."

Hunter's chief clerk signed a report, dated November 8, 1902, upon a form which provided as follows:

"Cause of accident. If accident was caused by defective equipment, track or appliances, whose make. Give style of apparatus, and cause of failure, when and where last inspected. If by carelessness of an employee, how long had he been on duty, how much rest prior to going on duty, and how long engaged by this company in capacity in which he was then acting, and how long by other companies:

"Tank wheels left rail, causing engine to be derailed also. *Unable to account for it.*"

Then follows various other items not material.

Hunter testified that his chief clerk was authorized to make reports of this character from reports submitted to him by trainmen. He says, speaking of his chief clerk: "He arrives at his conclusions from the reports that are prepared by the employees, and are in front of him at the time, and he makes up his report from them."

The telegraphic report made by Hunter was dated "1-40 p. m., October 14th." At that time everything was clear for the trains to move, and it was after the conversation which Hunter claims to have had with Green and Wilcox, when they stated the accident was due to the absence of splashers and side bearings.

So far as the report of the chief clerk is concerned, Hunter said he could not tell whether he authorized it or not.

The foregoing testimony is unsatisfactory, and falls short of reaching the point of causal connection between the alleged negligence and the derailment. It gives no definite description of a side bearing, its manner of construction, or how it operates, beyond the fact that it is designed to steady the tank and prevent tipping. The same may be said of the splashers. It appears that drawings and models were used and referred to at the trial. They are not before us. To say that a track is "rough" or "soft" or that it was curved, means little or nothing. Whether the curve was gradual or sharp we do not know. Witness Hunter comes nearest to connecting the absence of the side bearings with the derailment, when he says: "The absence of the side bearings will prevent the truck from curving with the car or engine. The absence of side bearings would produce the effect—of course the tank would follow the engine, and the absence of side bearings would produce a rigid truck, and the truck would take to the curve and climb the highest point of the curve—just outside the curve." Question: "What becomes of the truck when it climbs

that way.'' Answer: ''It would be liable to derail the truck.''

The witness is here evidently speaking of a tender running the usual way, behind and following the engine. His statement is very obscure. His only experience in railroading had been as yardmaster and division superintendent. He did not qualify as to engines. He states that the absence of side bearings from a truck would be liable to derail the truck; that is, the truck on which the bearings were lacking. It is clear from the evidence of all the witnesses that side bearings were absent from the front trucks. Yet this witness, in his telegraphic report, states that the rolling of the tank caused the *rear* tank truck (which was equipped with side bearings) to leave the track.

Witness Wilcox also says that when the tank ''started to rolling, the engine rolled, and the next thing it hit the ties—the *back* wheels of the truck hit the ties.'' Surely absence of side bearings from the front truck of the tender would not cause the engine to roll. It does not appear that the rolling of the tank would cause the engine to roll. So far as the testimony goes, it would appear that both engine and tank rolled from some common cause, not due either to the absence of side bearings from the front trucks, or of splashers from the tank; possibly, because of the curve. It cannot be inferred from the mere fact that the appliances referred to have a tendency to prevent rolling, that their absence will cause a derailment, when we know as a matter of common knowledge that cars and engines do roll and become derailed without reference to such appliances.

It is significant that the several witnesses for plaintiff who testified as to the functions of side bearings and splashers were not asked to give their opinion as to whether their absence could have produced an effect sufficient to cause a derailment. One attempt only was made. Witness Snyder, a locomotive en-

gineer, was asked this question: "What would be the effect in passing over a rough track, with a tank that had no side bearings on the front trucks, the engine running backward at ten miles an hour, with no splashers in the tank, with a 4500 gallon tank, like they had on engine No. 1107?" Answer: "Well, at ten miles an hour, the tank ought to ride all right."

We disregard the opinions attributed by witness Hunter to engineer Green and fireman Wilcox as to the cause of the wreck. They were incompetent. True, they were not objected to on this ground, and their admission for that reason would not be reversible error; but we are not prepared to hold that a verdict can be sustained on incompetent hearsay opinions, even if not objected to. Neither witness Wilcox, who testified for the plaintiff, nor engineer Green, who was in the court room, was asked to testify as an expert on this point.

The written reports sent by the plaintiff, engineer, fireman and superintendent to their superiors indicate clearly that at that time they had no thought of attributing this derailment to either ground of negligence laid in the second amended petition. The original petition, preserved in the record, contained but one specification of negligence, to-wit:

"That the roadway at the point at which said derailment occurred was negligently and carelessly allowed to become and remain in a dangerous and defective condition, so that engines passing over the same were liable to become derailed; that the ties at said point which supported the rails of said tracks were old, decayed, defective and weak; that the rails, fishplates, bolts and spikes were old, rusted and weak, and liable to bend, break and pull from their positions; that the dirt and ballast was loose, soft, and liable to give and slip under the weight of engines passing over the same; that all of said defective and dangerous conditions were known to the defendant, or by the

exercise of reasonable care and diligence might have
been known in time to have remedied the same, and
so have prevented the injuries to plaintiff.''

The first amended petition charged negligence
thus: ·

''That the point at which said derailment occurred
was negligently and carelessly allowed to become and
remain in a dangerous and defective condition so that
engines passing· over the same were liable to become
derailed, in that the ties at said point which supported
the rails of said tracks were old, decayed, defective
and weak; that the rails, fishplates, bolts and spikes
were old, rusted and weak, and liable to bend, break
and pull from their positions; that the dirt and bal-
last was loose, soft and liable to give and slip under
the weight of engines passing over the same; that all
of said defective and dangerous conditions were known
to the defendant, or by the exercise of reasonable care
and diligence might have been known in time to have
remedied the same, and so have prevented the injuries
to the plaintiff; that said engine and tender were at
the time of said derailment being run backwards upon
the said track, and unattached to any cars or other
rolling stock, and that the same were being carelessly,
negligently and unskillfully run by the defendant, and
its agents and employees who were in charge of the
same, to-wit, the engineer and fireman, at a reckless,
unsafe and dangerous rate of speed, to-wit, from
twenty to twenty-five miles per hour.''

No witness attempts to connect the absence of
splashers with the cause of the wreck. Taking all the
evidence for plaintiff relative to splashers and side
bearings into consideration, we can find no substantial
ground for a reasonable inference that their absence
caused the wreck, or that their presence would have
prevented it.

As to the charge of a defective track, one witness,
Wilcox, says it was ''rough''—nothing more. Another

witness says it was a "soft track." There was also testimony to the effect that the track was not well ballasted at this point. All this is far from showing that the track was in a dangerous condition, and liable to derail an engine running at ten miles an hour. We apprehend that rough tracks, soft tracks and unballasted tracks are not *per se* dangerous; nor are they unusual. No witness attempts to ascribe the derailment to the condition of the track, and a jury should not be permitted to infer that the wreck resulted from such condition.

The evidence in this case leaves us in the realm of conjecture. We think it sheds but little light on a subject which was so dark that the superintendent's office, on November 8th, nearly a month after the occurrence, with all the reports and information at hand, reported that it was "unable to account for it." If the derailment of the engine was due to the causes alleged in the petition, it would seem that experienced railroad men should be able to show by their testimony that the derailment was the proximate result of such causes. We know that the engine was derailed. We know that there was a cause. We may assume from the evidence that side bearings and splashers tend to prevent derailing; but can we conclude from these facts that their presence would prevent the derailment? We think not, because it does not appear that, even with these appliances, an engine cannot or is not liable to leave the track. In the above cases of Jones v. Railroad and Smith v. Fordyce it is clear that the act was due to the alleged acts of negligence, namely, the absence of proper brakes and a derailing switch. Had these appliances been present the event would not have occurred. In this case, so far as the evidence shows, the event might have happened even if the appliances had been properly attached. That is to say, an engine and tender, equipped with side bearings and splashers, running backward at ten miles

an hour, without cars attached, might, on a good track, from some unexplained cause, derail on a curve. In the above cases, the alleged acts of negligence were certainly the proximate cause. In this case the alleged negligent acts are at most a conjectural proximate cause.

**Excessive Verdict: $30,000.**  V.   We regard the verdict as excessive; but our disposition of the case renders any order in that regard unnecessary.

Because the evidence does not sustain the verdict, we reverse the judgment and remand the cause.

PER CURIAM.—Coming into Banc on the dissent of KENNISH, P. J., and BROWN, J., the opinion of FERRISS, J., written when he was a member of this court, is adopted as the opinion of the court. *Lamm, C. J., Graves, Walker* and *Faris, JJ.,* concur; *Woodson, J.,* concurs in all but the order remanding, in a separate opinion; *Brown* and *Bond, JJ.,* dissent, and vote for affirmance in a small sum, in a separate opinion by *Brown, J.*

## CONCURRING OPINION.

WOODSON, J.—I fully concur in the opinion written in this case by Judge FERRISS, prior to his leaving the bench, except as to remanding the cause, but I wish to add a few observations to what he so ably said regarding the causal negligence of the case.

All of the authorities agree that in order to justify a recovery in an action of this character, the evidence must not only show that the defendant was guilty of negligence, but must go one step further and establish the further fact that said negligence of the defendant was the direct or proximate cause of the plaintiff's injury, which may be done by direct or positive testimony, or indirectly, by reasonable inferences

drawn from the facts and circumstances proven in the case.

While the evidence is conflicting as to whether the tender contained splashers and side bearings, yet for the purpose of these remarks I will concede that both were absent and that said absence was negligence on the part of the defendant, nevertheless, I am unable to ascertain from this record how that negligence either caused or contributed to the injury of plaintiff.

It is a well known fact, as this record discloses, that engines, tenders, and trains also, for that matter, "jump the track" with and without those
**Causal Connection.** safety appliances; and while they may and do in a degree, lessen the liability of them leaving the track, yet I have never seen or heard of a case where it was either conceded or proven that the derailment would not have happened had the tender been so equipped. It is and always has been more or less a conjecture as to whether or not they ever prevented a derailment, which otherwise would have occurred had they not been present, and especially is that true in this case. All of the undisputed facts in the case strongly point to the contrary. For instance, the plaintiff himself testified that the road-bed was "pretty soft, sandylike," and that he "sank down into it, . . . and my feet went down in the soil," . . . but I "didn't wait to look to see how deep, but I know I went down quite a ways, . . . Yes, sir; I know it was good and soft."

There was other evidence tending to show that the ballast had washed from under the ends of the ties, which left them projecting out in the air.

The plaintiff also in testifying as to this matter said: "The ties were broken and stuck up on the ends; just like breaking them in two, and they stuck up."

This evidence fully and clearly shows the cause of the derailment. The earth was soft, and the ballast was washed from under the ends of the ties, leaving them projecting in the air, and of course left the center of them resting upon the earth or ballast not washed or disturbed; and when the heavy tender and engine backed up and over the track in that condition, the great weight being upon the end of the ties, having no support, they snapped or broke in two at the center, at the points where they rested upon the earth and thereby caused the ends thereof to stick up in the manner described by the plaintiff.

Cause of Derailment.

That is the only rational theory disclosed by the record, upon which the derailment could have happened; and that being true, it is perfectly apparent therefrom that neither the presence nor absence of the side guards and splashers mentioned, did or could have added to, caused or prevented the accident.

In addition, the plaintiff and other members of his crew, testified that they examined the engine and tender at the time of the derailment and knew of the absence of said safety appliances, yet they, at that time, never attributed the accident to the absence of said appliances, for they reported to their superior officer that they did not know the cause of the derailment.

Moreover, with no intention of criticising the learned counsel for plaintiff, the whole case, as I view it from the record, is totally destitute of all merit.

The plaintiff was in charge of the train, rather the engine and tender, and at the time of the accident he and his associates made an examination of the situation to ascertain and report, as was their duty, the cause of the derailment, and after so doing, they made some two or three reports

No Merit in Case.

to their superior officer, to the effect that they could not discover the cause of the accident; also that no one was injured thereby.

According to the plaintiff's own testimony, it was something like a month before he discovered that he had sustained any personal injuries whatever in consequence of said accident. At the end of that time he began to discover that he was very seriously injured, so much so that he sued for $35,000, and recovered a verdict and judgment for $30,000.

It is a strange coincident that about the same time he discovered he had sustained injuries, he also began to discover the cause of the derailment of the engine which he claims caused the injury, which at first he charged to the defective condition of the track and railroad bed, but subsequently, he discovered that it was due to the absence of side bearings and splashers on the tender, etc.

When I view this entire case, in all of its bearings, I am fully satisfied that it is totally destitute of all merit, and for that reason I believe the judgment should be reversed and the cause dismissed.

## DISSENTING OPINION.

BROWN, J.—I concede that the judgment of the trial court is excessive and ought to be reduced, but I do not believe the record contains any error which necessitates remanding the cause. *Bond, J.*, concurs in the views herein expressed.